The first case today that we'll be having argument in is Ahearn v. O'Malley, and it looks like we've got a repeat performance of yesterday with Counselor Janich and Modi. So I think, Mr. Janich, you'll go first and let us know again how much time you want to reserve for rebuttal, and you'll see I'm not very good at that, but you saw that yesterday, but we'll endeavor to do better today. Go ahead, Mr. Janich. Thank you. May it please the Court, my name is Eitan Janich. I'm representing Stephen Ahearn in this appeal, and I would like to reserve at least two minutes, although we'll see. Okay. Ahearn has been unable to work since at least May 2020 as a result of the functional effects of his impairments, which include major depressive disorder, generalized anxiety disorder, and borderline intellectual functioning. In this case, the ALJ erred by improperly failing to evaluate any of the medical evidence that was dated prior to January of 2020. And this includes medical opinions from Dr. Wilkinson, Dr. Riddell, and Dr. Wingate, who were three examining psychologists, and a non-examining psychologist, Dr. Eisenhower, who reviewed some of their opinions. All of these psychologists described findings which support their medical opinions, and their opinions show that he is more limited than he was found to be by the ALJ. Now, the ALJ didn't evaluate this evidence because most of it was part of a previous application which was denied, but it's still relevant, I think, to evaluating the current evidence and to show the longitudinal nature of his impairment, and to show that the current evidence is both supported and consistent. So then the ALJ erred. Well, one thing the ALJ did, she did not evaluate a 2019 evaluation by Dr. Wilkinson. That was never evaluated in any previous decision, and she ignored it, did not acknowledge it, but did not discuss it. The ALJ then also erred by improperly rejecting Dr. Wilkinson's January 2020 medical opinion. She did not state any valid reasons supported by substantial evidence for rejection of his opinion. In addition to that, the ALJ erred by improperly rejecting Ahern's testimony about his symptoms and limitations. None of her reasons were specific, clear, and convincing. And the ALJ erred by improperly failing to evaluate the lay evidence from an SSA interviewer, C. Hand. Now, with regard to Ms. C. Hand's statement, what was interesting about this, under Social Security regulations, the regulations that are in effect here, an ALJ is required to evaluate the observations of Social Security employees, such as C. Hand. The ALJ acknowledged her statement, but did not explain how she was evaluating it, because under what I believe is a serious misinterpretation of the revised medical evidence regulations, the ALJ thought she did not have to discuss this or articulate how she was evaluating it. Now, often these observations don't say much. Sometimes it's just a few words here or there. But what's interesting about C. Hand's statement is it's actually a narrative that discusses the difficulty that Ahern was having just answering basic questions, how his communication skills were very much impaired. And by itself, this doesn't prove that disability, but when it's considered along with Dr. Wilkinson's findings and opinion, and all of the previous psychologists' findings and opinions, it does confirm that Ahern has longstanding difficulty with basic communication skills. Mr. Janisch, the residual functional capacity did take considerable account of mental difficulties, did it not? It did, but it didn't fully account for his problems. I think the most significant problem missing here is his pace. And that's part of what related to C. Hand's observations, that he was very slow to understand things and to figure things out and had to have things repeated to him. And the same has been found by all of the psychologists who evaluated him, that his pace is off, and he even talked about he had lost jobs, several jobs, where his pace was off. Given the extent of the psychological evidence and mental health evaluations over the years, I guess one of my questions is how much one lay interview really adds to the insight in drawing the fine lines or fine distinctions that sometimes have to be drawn in cases like this, between marked and moderate limitations and so on. That's a fair question. I think that the main significance of it is that it confirms, it's just one more viewpoint from one more observer that shows that he's not able to communicate on basic questions, basic things that you would expect a person could communicate about. I think the strongest evidence here is Dr. Wilkinson's opinion, and the fact that his prior opinion, one year earlier, was completely disregarded. That opinion is very significant because it provides longitudinal support for Dr. Wilkinson's opinion about that Ahern could not sustain competitive work. He could not maintain normal pace and attendance. I think that you're right. While that alone doesn't change the picture in a big way, it's one more piece of the puzzle that shows that the ALJ improperly rejected Dr. Wilkinson's opinions. If the court doesn't have any other questions, I would reserve my time for rebuttal. Thank you. Well, thank you. We'll turn to the government's turn. Good morning. May it please the Court, Asim Modi on behalf of the Commissioner of Social Security. This case, involving the latest in a series of disclaimers applications for social security disability benefits, involves a relatively narrow time period, May 2020 through October 2021. And within this nearly 18-month period, the claimant worked under the table for a friend performing yard work. He was searching for other employment and declared that he was ready to join the rat race after leaving work in 2012 for reasons unrelated to his allegedly disabling impairments. During this period, he cared for himself and his pet. He used a smartphone, socialized with friends, and carried out a range of, performed household chores and errands, and carried out a range of hobbies and interests, including fishing, crocheting, reading, and streaming content on mobile devices. During this period, mental status examinations yielded largely unremarkable findings, and the claimant reported that he felt much better when he took psychotropic medication, and he admitted to his counselors that treatment reduced his symptoms to 1 out of 10 in terms of severity. So what are we to do with our holding in Reddick that claimants shouldn't be penalized for attempting to lead normal lives? And some of the things that you mentioned seem like an attempt to just lead a normal life. Well, Your Honor, I think as this Court has repeatedly held, I think most recently in Smart v. Kijikazi, but earlier in cases such as Molina, an ALJ can use the claimant's day-to-day functioning to evaluate claims of totally debilitating symptoms, which is that case here. The claimant is alleging that due to his psychiatric symptoms, he was largely unable to do anything in the course of the day, and I think that is what my opponent mentioned as well, that he was largely incapable of doing anything due to his symptoms. And the ALJ recently pointed out that the claimant's activities during this period were inconsistent with those allegations, that during this period the claimant was working for a period of time. He had been working under the table for a friend doing yard work, that he was seeking out other employment, and he was engaged in a number of different hobbies and interests as well during this period. And so even if these activities do reflect a difficulty in the claimant's functioning, which is not in dispute here, the ALJ did find that the claimant had significant mental limitations, the claimant's capacity to carry out those activities should be reasonably viewed as inconsistent with his allegations of wholly debilitating symptoms and limitations. And that's the finding that the ALJ made here, Your Honor. Mr. Modi, could I ask you to address the evaluation of Han's report on the interview, and in particular to compare and contrast a little bit with the Connolly case from yesterday, where you and Mr. Yonich and we were all considering a similar issue. This ALJ's treatment of that lay evidence seems more cursory than we saw in the same ALJ's treatment of the evidence in Connolly. Well, Your Honor, I think a distinction can be made between the two cases. There's one commonality between both of these cases, which is that the ALJ, the same ALJ, addressed both of these observations from non-medical sources. And here, the ALJ plainly said that these observations were considered when determining the claimant's functional capacity. But in this case, unlike in Connolly, the ALJ didn't explain further what kind of persuasiveness was attached to these statements. And I think the distinction is that in Connolly, there, the claimant's friend had gone into some detail about what he perceived to be the claimant's symptoms and his functional limitations stemming from his impairments. And so there was, in essence, some kind of testimony about the claimant's functional limitations. Here, I don't think we have that, because we have one interview, right? Excuse me? We have one interview as opposed to a longitudinal relationship. Exactly, Your Honor. We have a single — this is a telephone conversation that this agency employee had with this claimant during the intake of his social security disability claim. And I think — well, first of all, I want to emphasize that this employee's observations are entirely consistent with what the ALJ found. Because this employee noted, and as the ALJ noted as well in the decision, that the claimant seemed to have limitations in his comprehension and concentration. And the ALJ agreed, and the ALJ found that the claimant had moderate limitations in understanding, remembering, and acquiring information, and had moderate limitations in his concentration, persistence, or pace, and accordingly restricted the claimant to only simple routine work involving no fast-paced work and only simple work-related decisions. And so there's no inconsistency between what this agency employee observed and what the ALJ found regarding the claimant's mental limitations. But I also want to caution that I think this Court has noted recently, and I'll be in an unpublished case from about four months ago, the case name is Banas v. O'Malley, and it dealt with similar observations from an agency employee. And this Court noted in this order that caution against attaching too much value to these kind of agency observations because they're made, the agency employees have very limited interaction with the claimant. This is a one-time conversation. In this case, it was done over the telephone, and the observations are done in a short narrative summary. And so they should not be sort of viewed the same as some kind of, you know, detailed assessment about the claimant's impairments and what they can do. How do you spell the name of that case? Sure, Your Honor. The name is Banas, B-A-Y-N-E-S-S. And the case number is 23-35246. I think it was a case from, I think the order came down in June of this year, Your Honor. Thank you. So I think, hopefully, Your Honor, that addresses your question regarding the ALJ's assessment of Hahn's statement in this case. But going back to the points raised by my opponent, rather than engage with the evidence from the relevant time period here that underpins the ALJ's nondisability decision, the claimant goes back in time and points to opinions that have no probative value in this case because they don't address the question of the claimant's functioning during the period at issue, and that many of these opinions were considered and rejected by ALJs deciding claimant's earlier applications in decisions that are now administratively final and with one such order being affirmed by this case in a precedential decision. And to the extent that the claimant can point to any relevant medical evidence endorsing his allegations of marked mental limitations during the period at issue, the ALJ reasonably pointed out that this opinion evidence suffered from the same deficiencies as the claimant's own subjective reporting, that it lacked support for the unremarkable mental status findings, the claimant's reported improvement with treatment, and the claimant's capacity to work and carry out other daily activities. So based on this record, ALJ reasonably found the claimant was not disabled during this narrow time period that isn't issued here, and ultimately claimant's dissatisfaction with the outcome of the ALJ's analysis is not valid grounds for reversal under this Court's applicable standard review. So at this point, should the Court have any other questions, I'll be happy to answer them. Seeing none, thank you very much. We ask that this Court affirm the Commission's final decision. Thank you, Your Honor. Come back to Mr. Yannich. Thank you. I would want to, first of all, respond to opposing counsel's comments about Ahearn claiming that he was incapable of doing anything or that he had wholly debilitating symptoms. These are loaded words that aren't consistent with the record. Ahearn never gave up here. He continued to try to figure out if there was something he could do. He even started working with DVR when that was not a Division of Vocational Rehabilitation, and he walked away from it because he just didn't believe it could work for him. He's got very limited understanding of being able to access services. He was living with his mother after he lost his job a decade ago, and after she passed away, he became homeless. He was homeless for four and a half years. He couldn't manage to even get himself a place to live or be housed. He's living in a community where they have a shared kitchen and shared bathing facilities, I believe, but he's got a small house and he's got a roof over his head, and that helps him a lot. He is doing better than he was. The issue, though, is, is he doing well enough to be able to perform competitive work? The issue here is not, does he have wholly debilitating symptoms? No, he's probably employable if he were able to successfully hook up with DVR and get trained and get placed in a kind of a supported work environment. The problem is he's not able to just do competitive work because of the issues with his pace and with his comprehension. He would need an understanding employer and he would need special job placements. So there's nothing inconsistent with him seeking that and with the fact that he can't do competitive work. With regard to the moderate limitations in concentration, persistence, and pace found by the ALJ, that does not capture Ahern's actual limitations. He couldn't even understand how to answer basic questions from a Social Security employee about work he'd done and things like that and just who his doctors were, who he sees. It was just too complicated for him. Finally, the fact that we rely to a great extent in this case on psychological evaluations that predate the current application is to the nature of Social Security disability adjudication. There are opinion after opinion after opinion after opinion after opinion of every single examining psychologist that ever examined Ahern in the record. They all say he's got marked functional limitations. These were rejected last time and now here he is. He's gotten a little better, but he's basically the same person. Once again, we've got two more psychological evaluations from an examining psychologist that says the same thing. I think that all those previous evaluations are significant because they support the current ones. I therefore do ask that you remand this case for a new hearing. Thank you, Mr. Janich. Thank you to both counsel for your argument today. This case will be submitted as of today's date.
judges: Hamilton, VANDYKE, THOMAS